## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) **Chapter 11** |
| **VERIFIED IDENTITY PASS, INC.** | ) |
| | ) |
| **Debtor** | ) **Case No. 09-17086** |
| | ) |

## AFFIDAVIT OF JAMES E. MARONEY REGARDING FIRST DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, I, James E. Moroney, hereby declare as follows:

1.      I am the President of Verified Identity Pass, Inc. ("Verified" or the "Company"), the debtor-in-possession in the above captioned bankruptcy proceeding.  I have served in this capacity since March 2009.  I am familiar with Verified's day-to-day operations, business and financial affairs, particularly the efforts by Verified to restructure its debt and its efforts to sell the business.

2.      Except as otherwise indicated, all statements in this affidavit are based upon (a) my knowledge as President of Verified, (b) my review of relevant documents, including Verified's books and records, (c) information supplied to me by other members of Verified's management and/or Verified's professionals, and (d) my opinion based on my experience.  If called upon to testify, I would testify to the facts set forth in this affidavit.

3.      On November 30, 2009 (the "Petition Date"), Verified filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") with this Court.

4.      I submit this affidavit in support of the first day motions and applications filed in Verified's Chapter 11 bankruptcy proceeding.

## Verified's History and Operations

5. Verified was founded in 2003 by Steven Brill, who also served as Chief Executive Officer until February 2009 ("Brill"). Verified developed and owned certain intellectual property which allowed Verified to collect biometric data from individuals and use that data to conduct security screenings.

6. The Debtor implemented its intellectual property to design and build a network of private security checkpoints at a number of heavily-trafficked airports. Verified named its network Clear. The Clear network was designed to expedite air travel for frequent flyers by allowing them to circumvent crowded security lines.

7. Clear collected biometric information of its members, including iris scans and fingerprints (the "Customer Data").[1] From other personal data supplied the TSA performed background checks on CLEAR members. These background checks ceased in August of 2008 at the approval of the TSA. Initially, subject to the results of its security screens, Verified issued cards which allowed qualified members to use a designated Clear line at airport security checkpoints. The program enabled airports to offer enhanced expedited services to travelers, who were prescreened, while simultaneously addressing security concerns.

8. Verified marketed the Clear network to frequent travelers. The annual membership fee for use of the Clear service was $199. As of June 4, 2009, the Company had approximately 188,000 members and had processed more than 2.5 million travelers through its Clear gates.

---

[1] All Customer Data was subsequently encrypted and maintained pursuant to the standards of the Transportation Safety Administration at an off-site facility maintained by Lockheed Martin.

9.     To finance its operations, the Company obtained various investment financings and a loan from Morgan Stanley Services Fund, Inc. and Morgan Stanley & Co. Incorporated (the "Lender").

10.     The loan from the Lender is evidenced by, among other agreements, a certain Senior Secured Credit Agreement dated as of December 21, 2006 (as amended or supplemented, the "Credit Agreement"), among Verified, the other Credit Parties thereto from time to time as Guarantors, the Lenders party thereto from time to time ("Lenders"), Morgan Stanley Senior Funding, Inc. in its capacities as Administrative Agent and Syndication Agent ("Agent"), and Morgan Stanley & Co. Incorporated as Collateral Agent ("Collateral Agent").   In connection with its obligations under the Credit Agreement, the Company pledged to the Collateral Agent for the benefit of the Lenders substantially all of its assets.

11.     Under the Credit Agreement the Debtor is indebted to the Lenders in the approximate amount of $32,000,000.

12.     Despite its expanding business and large number of customers, the Company could not meet its obligations to its lender or its other creditors.

**Efforts to Restructure**

13.     In March 2009, as a result of concerns over continuing losses and substantially diminished working capital and to assist the Company in restructuring its debts, the Board of Directors retained the services of Dorman & Fawcett.  Further, at the direction of the Board of Directors, I replaced Brill as President, in part, due to my experience in restructuring distressed companies.

14.     The Company subsequently began, in earnest, negotiating with the Lender to restructure its debt and also sought additional financing options.

15.     The Company met with its Lenders and explored a variety of options with respect to its obligations, while coordinating an active solicitation of additional lenders and investors. The Company was able to garner significant interest in prospective funding arrangements with several potential investors/lenders, but was unable to ultimately negotiate a comprehensive restructuring of its debt between and among the Lenders and any outside investor/lender.

16.     Among others, a group of shareholders formulated a proposal for the purchase of the Company for an approximate $8,000,000 investment.  The financial details of that deal could not, however, be formalized between the proposed purchasing group and the lender.

17.     Following unsuccessful negotiations with the Lenders and other interested financiers and purchasers, Verified could not secure additional financing necessary to maintain its operations beyond June 22, 2009 and ceased operating on that date.

**Efforts to Sell**

18.     As a result of its financial difficulties, the Company determined that a sale of its assets was in the best interest of the Debtor and its creditors.

19.     Simultaneously with its efforts to restructure its debt, the Company began soliciting bids from interested parties for the purchase of interests in the Company or substantially all of the Company's assets.

20.     In connection with the marketing of its assets, the Company created a solicitation package including a nondisclosure agreement for interested parties to review and execute in connection with their investigation of the Company for sale purposes.

21.     The Company aggressively marketed its assets from April 2009 and I estimate that at least ten separate potential third party buyers were involved in negotiations with the

Company and executed nondisclosure agreements and reviewed the Company's books and records.

22.    The Company actively engaged in negotiations with WidePoint Corporation, Henry Incorporated and L-1 Identity Solutions.  Both Henry Incorporated and L-1 Identity Solutions presented proposed Asset Purchase Agreements and the Company, along with its Lender, negotiated the terms of the Asset Purchase Agreements to eliminate or restructure contingencies to closing and to ensure the protection of the Customer Data in connection with a sale.

23.    Ultimately, the Company decided to proceed with a sale.

**Verified's Chapter 11 Case**

24.    As of the Petition Date, the Company estimates that it holds assets with a book value of approximately $7,000,000 to $10,000,000, including the following:

      a.    Personal property consisting of kiosks at various airports, signage, laptop computers, office equipment and furniture;

      b.    Intangible property consisting of intellectual property, Customer Data and contracts.

25.    The Company issued eight (8) classes of stock, comprised of seven (7) classes of secured stock and one (1) class of common stock and approximately 11,300,000 shares, held by thirty-three (33) entities or individuals.  In addition, the Company has issued warrants for an additional 14,000,000 shares.  No holders of the Company's stock are officers or directors of the Company, except that approximately 1,200,000 shares of stock or 8.5% are held by Brill or entities which Brill owns or controls.

26.     Attached to this affidavit as <u>Exhibit A</u> is a listing of the Company's twenty (20) largest creditors as of the Petition Date, including addresses and other contact information.

27.     The sole secured creditor of the Company is the Lender, whose principal address is 1585 Broadway, New York, New York 10036.

28.     Following the termination of the Company's business, much of its personal property was located in various airports and storage locations.  Due to retrieval, transportation and storage costs, the Company has been unable to take possession of such personal property, including but not limited to the kiosks and other installations.  Consequently, the Company's personal property is presently held in the following locations:

a.      Albany County Airport
        737 Albany-Shaker Road
        Albany, NY 12211

b.      Hartsfield – Jackson Atlanta International Airport
        6000 North Terminal Parkway
        Atlanta, GA 30320

c.      Orlando International Airport
        One Airport Boulevard
        Orlando, FL 32827-4399

d.      Salt Lake City International Airport
        776 North Terminal Drive
        Salt Lake City, Utah  84116

e.      San Francisco International Airport
        1 McDonnell Road
        San Francisco, CA 94130

f.      Oakland International Airport
        1 Airport Drive
        Oakland, CA 94621

g.      Westchester County Airport
        240 Airport Road
        White Plains, NY 10604

h.        Logan Airport, Delta (Terminal A)
1 Harborside Drive
East Boston, MA 02128

i.        Denver International Airport
8500 Pena Boulevard
Denver, CO 80249

j.        Kenton County Airport
P.O. Box 752000
Cincinnati, OH 45275-2000

k.        John F. Kennedy International Airport
The Port Authority of New York and New Jersey
Queens, NY 11422

l.        LaGuardia International Airport
Flushing, NY 11371

m.        Ronald Regan Washington National Airport
1 Aviation Circle
Washington, DC 20001

Washington Dulles International Airport
45020 Aviation Drive
Sterling, VA 20166-7506

n.        Indianapolis Airport Authority (IAA)
7800 Col. H. Weir Cook Memorial Drive, Suite 100
Indianapolis, IN  46241

o.        JFK International Air Terminal LLC
Terminal 4 Corporate Office
JFK Airport Room 161.022
Jamaica, NY 11430

p.        Little Rock National Airport
One Airport Drive, Adams Field
Little Rock, AR  72202-4489

q.        Newark Liberty International Airport
10 Toler Place
Newark, NJ 07114

r.        Mineta San Jose International Airport
1661 Airport Boulevard
San Jose, CA 95110

s.        Gomez Construction Company
750 Jackson Ave.
Winter Park, Florida 32789

t. Various locations of Meridian Worldwide
d/b/a Greater Bay North American
PO Box 49131
San Jose, CA 95161-9131

29. The following is a list of the premises under lease agreement with the Company:

a. 600 Third Avenue, 10th Floor, New York, NY

b. All of the premises listed in paragraph 28, above.

30. The Company has surrendered the lease at 600 Third Avenue, 10th Floor, New York, NY 10016, and placed all of its equipment, office furniture, along with its books and records, in storage. The personal property is being stored at The Time Record Storage Co., 628 West 45th Street, New York, New York 10036. The Company's information systems hardware and all electronic data (excluding customer data) were moved to RGTS, 1221 Avenue of the Americas, New York, New York 10020-1095

31. As of the filing of this affidavit, I am aware of two pending actions against the Company, captioned as follows:

a. A certain civil action pending in the United States District Court for the Southern District of New York, styled <u>In re Verified Identity Pass, Inc. Consumer Litigation</u>, Lead Case No. (09-cv-5951 (RJH), which consolidated approximately ten consumer class actions seeking class certification and recovery relating to claims arising from the cessation of Verified's business activities and the protection of Customer Data; and

b. A certain civil action brought by former President Steven Brill seeking damages for breach of employment contract, pending in the Supreme Court of the State of New York, County of New York, styled <u>Steven Brill v. Verified Identify Pass, Inc. *Index No. 601462/2009)*</u>.

32.     Due to the cessation of the Debtor's business, I am the sole representative of the Debtor's senior management.  I was first hired in March 2009, as a result of the Company's continuing losses and to assist the Company in its restructuring efforts.  At present, I am primarily engaged in negotiating the proposed sale of the Company's assets and resolution of the claims by the Lenders and others.

33.     The Company determined that it was in its best interests to pursue a sale of its assets pursuant to Section 363 of the Bankruptcy Code and filed its petition with this Court on the Petition Date.

34.     The Company has been in negotiations with potential buyers and has reached substantial agreement in principle to sell its assets.  The Company expects to file a motion to sell within seven (7) days.

**Motion by Debtor for Appointment of a Consumer Privacy Ombudsman**

35.     In connection with the contemplated sale of its Assets, the Company has filed the *Motion by Debtor for Appointment of a Consumer Privacy Ombudsman* (the "Ombudsman Motion").

36.     The assets which Verified is seeking to sell include, among other things, certain proprietary personal biometric information collected from its customers in the ordinary course of its business and referred to as the Customer Data.

37.     Professor Paul Schwartz served as the Company's privacy ombudsman during its operations.

38.     The Customer Data is presently stored in accordance with applicable non-bankruptcy law.  Verified shall transfer the Customer Data to any buyer of its assets subject to approval by each of its customers.

39.     In order to maintain the Customer Data during this proceeding and ensure its secured transfer to any buyer, the appointment of an ombudsman is appropriate under the circumstances.

**Motion for Entry of an Order (I) Authorizing the Use of Cash Collateral, (II) The Granting Adequate Protection (III) Scheduling a Hearing regarding the Further Use of Cash Collateral; and (IV) Granting Other Relief**

40.     Verified has filed the *Motion for Entry of an Order (I) Authorizing the Use of Cash Collateral, (II) The Granting Adequate Protection (III) Scheduling a Hearing regarding the Further Use of Cash Collateral; and (IV) Granting Other Relief* (the "Cash Collateral Motion") seeking authority to use cash constituting collateral of its secured pre-petition lenders for the payment of necessary costs and expenses associated with this proceeding and the sale of its assets.

41.     In exchange for the use of cash collateral, Verified has agreed to grant to its lenders, Morgan Stanley Senior Funding, Inc. in its capacities as Administrative Agent and Syndication Agent and Morgan Stanley & Co. Incorporated as Collateral Agent (collectively, the "Pre-Petition Secured Parties") first priority perfected superpriority liens (the "Superpriorty Liens") on any cash, accounts receivable and any other assets of the Company and any proceeds thereof, subject to the payment of professional fees as approved by the Court.  The Superpriority Liens shall be recognized only to the extent of the diminution in value of the Prepetition Secured Parties' interest in their collateral resulting from the sale, lease or use by the Company of cash collateral and any other collateral and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code.

42.     Verified requires the use of cash collateral to conduct its operations during this proceeding and to effectuate the sale of its assets.

43.    Without the use of cash collateral, Verified's assets would become endangered and it would likely be required to sell its assets by forced liquidation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of December, 2009

*/s/ James E. Moroney*
James E. Moroney

::ODMA\PCDOCS\DOCS\547635\1