UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) ) ) | |
| VERIFIED IDENTITY PASS, INC. | ) ) ) | Chapter 11 |
| Debtor | ) ) ) | Case No. 09-17086-SMB |

### AFFIDAVIT OF JAMES E. MORONEY REGARDING SALE OF ASSETS

Pursuant to 28 U.S.C. § 1746, I, James E. Moroney, hereby declare as follows:

1. I am the President of Verified Identity Pass, Inc. ("Verified" or the "Company"), the debtor-in-possession in the above captioned bankruptcy proceeding. I am familiar with Verified's day-to-day operations, business and financial affairs, particularly the efforts by Verified to restructure its debt and its efforts to sell the business.

2. Except as otherwise indicated, all statements in this affidavit are based upon (a) my knowledge as President of Verified, (b) my review of relevant documents, including Verified's books and records, (c) information supplied to me by other members of Verified's management and/or Verified's professionals, and (d) my opinion based on my experience. If called upon to testify, I would testify to the facts set forth in this affidavit.

3. I submit this affidavit in support of the *Debtor's Motion (A) to Authorize Debtor to Effectuate Asset Purchase Agreement with Henry, Inc.; (B) to Authorize Sale Free and Clear of Liens, Claims and Interest; and (C) for Related Relief* (the "Motion to Sell").

### History of Verified

4. Verified was founded in 2003 by Steven Brill, who also served as Chief Executive Officer until February 2009 ("Brill").

5. The Company's business plan was to establish a network of private security checkpoints at a number of heavily-trafficked airports named CLEAR which was designed to expedite air travel for frequent flyers by allowing them to circumvent crowded security lines.

6. To implement its business plan, CLEAR collected biometric information of its members, including iris scans and fingerprints along with other personal information (the "Customer Data").[1] CLEAR initially supplied the customer data to the TSA, who in turn performed background checks on CLEAR members. These TSA background checks ceased in August of 2008. Initially, subject to the results of its security screens, Verified issued cards which allowed qualified members to use a designated CLEAR line at airport security checkpoints. The program enabled airports to offer enhanced expedited services to travelers, who were prescreened, while simultaneously addressing security concerns.

7. Verified marketed the CLEAR network to frequent travelers. The annual membership fee for use of the Clear service was $199. As of June 4, 2009, the Company had approximately 188,000 members and had processed more than 2.5 million travelers through its CLEAR gates.

8. Construction and operation of the CLEAR network, including the collection and maintenance of the Customer Data, required, among other things,: (a) a substantial investment of capital to build and maintain numerous security checkpoints and to fund the overhead required in staffing the CLEAR lines and the kiosks used to solicit customers, and cost of leasing space from various airports, (b) specialized operational software designed and managed by a finite number of suppliers, (c) the use of specialized encryption and privacy software to protect the Customer Data which was designed and managed by a finite number of suppliers and (d) a particular

---

[1] All Customer Data was subsequently encrypted and maintained pursuant to the standards of the Transportation Safety Administration at an off-site facility maintained by Lockheed Martin Corporation.

2

expertise in the fields of security and data management in order to operate a vast national network of security checkpoints.

9. To finance its operations, the Company obtained various investment financings and a loan from Morgan Stanley Senior Funding, Inc. in its capacities as Administrative Agent and Syndication Agent and Morgan Stanley & Co. Incorporated as Collateral Agent and certain other lenders (the "Lenders"). In connection with its obligations under the loan, the Company pledged for the benefit of the Lenders substantially all of its assets. Under the Loan, the Company is indebted to the Lenders in the approximate amount of $32,000,000, not including certain accruing interest and fees.

10. In addition, to further finance its operations and raise capital, the Company issued eight (8) classes of stock, comprised of seven (7) classes of preferred stock and one (1) class of common stock and approximately 11,300,000 shares, held by thirty-three (33) entities or individuals. In addition, the Company has issued warrants for an additional 14,000,000 shares.

11. The Company obtained significant capital investments from numerous parties, including certain of its vendors and other owners and operators of similar businesses, such as Lockheed . In addition, certain of the Lenders were also equity holders in the Company. Investors and equity holders were informed and knowledgeable of the Company's business operations.

12. Beginning in mid-2008 and 2009, despite its expanding business and large number of customers, the Company could not meet its obligations to its Lenders or its other creditors.

**Financial Distress and Efforts to Raise Capital**

13.     In March 2009, as a result of concerns over continuing losses and declining working capital and to assist the Company in restructuring its debts, the Board of Directors retained the services of Dorman & Fawcett.  At the direction of the Board of Directors, I replaced Brill as President, in part, due to my experience in restructuring distressed companies.

14.     In addition to my role as President of Verified, I am a principal at Dorman & Fawcett.  Dorman & Fawcett is a consulting and turnaround firm focusing on corporate restructurings.  It has over the past twenty (20) years represented companies in the construction, entertainment, hospitality, food products, printing, communications, equipment leasing, manufacturing and technology industries.  Dorman & Fawcett's personnel have specialized expertise in corporate restructuring, as financial and operational consultants performing business turnarounds and sales and liquidations of financially distressed companies outside of the bankruptcy context with very successful results.  Dorman & Fawcett typically advises both public and private companies with annual revenues of $20 to $100 million.

15.     Upon my assuming the role of President, the Company began, in earnest, negotiating with the Lenders and current Investor to restructure its debt.  Simultaneously the Company sought additional financing options.  Specifically, the Company met with its Lenders and explored a variety of options with respect to its obligations, while coordinating an active solicitation of additional lenders and investors.  The Company was able to garner significant interest in prospective funding arrangements with several potential investors/lenders, but was unable to ultimately negotiate a comprehensive restructuring of its senior debt.

## Closure and Efforts to Sell

16. Following unsuccessful negotiations with the Lenders and other interested financiers and purchasers, Verified could not secure the additional financing necessary to maintain its operations beyond June 22, 2009 and ceased operating on that date.

17. Due to the cessation of the Company's business, the Company terminated its employees but retrained certain key employees as consultants to assist in selling the Company.

18. Since June 22, 2009, my primary function on behalf of the company has been to solicit buyers for the Company and to engage in negotiating the proposed sale of the Company's assets and resolution of the claims by the Lenders and others.

19. At or around the time it ceased operations, the Company owned and operated security kiosks, employed personnel and possess property at the following airports:

   a. Albany County Airport
      737 Albany-Shaker Road
      Albany, NY 12211

   b. Hartsfield – Jackson Atlanta International Airport
      6000 North Terminal Parkway
      Atlanta, GA 30320

   c. Orlando International Airport
      One Airport Boulevard
      Orlando, FL 32827-4399

   d. Salt Lake City International Airport
      776 North Terminal Drive
      Salt Lake City, Utah 84116

   e. San Francisco International Airport
      1 McDonnell Road
      San Francisco, CA 94130

   f. Oakland International Airport
      1 Airport Drive
      Oakland, CA 94621

g.  Westchester County Airport
    240 Airport Road
    White Plains, NY 10604

h.  Logan Airport
    1 Harborside Drive
    East Boston, MA 02128

i.  Denver International Airport
    8500 Pena Boulevard
    Denver, CO 80249

j.  Kenton County Airport
    P.O. Box 752000
    Cincinnati, OH 45275-2000

k.  John F. Kennedy International Airport
    The Port Authority of New York and New Jersey
    Queens, NY 11422

l.  LaGuardia International Airport
    Flushing, NY 11371

m.  Ronald Regan Washington National Airport
    1 Aviation Circle
    Washington, DC 20001

n.  Washington Dulles International Airport
    45020 Aviation Drive
    Sterling, VA 20166-7506

o.  Indianapolis Airport Authority (IAA)
    7800 Col. H. Weir Cook Memorial Drive, Suite 100
    Indianapolis, IN  46241

p.  JFK International Air Terminal LLC
    Terminal 4 Corporate Office
    JFK Airport Room 161.022
    Jamaica, NY 11430

q.  Little Rock National Airport
    One Airport Drive, Adams Field
    Little Rock, AR  72202-4489

r.  Newark Liberty International Airport
    10 Toler Place
    Newark, NJ 07114

s.  Mineta San Jose International Airport
    1661 Airport Boulevard
    San Jose, CA 95110

20.     The Company also possessed an extensive customer list of its members and their Customer Data (the "Customer List"). The Customer Data is presently stored in accordance with applicable non-bankruptcy law with Lockheed at their secured location.

21.     Due to sizable storage costs and its agreements with certain airports, various parties, including but not limited to the Orlando Aviation Authority, have asserted ownership and setoff rights with respect certain of the Company's assets, including personal property, portions of the Customer List and Customer Data, which may have been stored at their locations.

**Prepetition Efforts to Sell**

22.     While the Company's primary efforts between March and June were to finalize financing and restructure its debt, it did begin initial marketing efforts. In that respect, the Company began soliciting bids from interested parties for the purchase of interests in the Company or substantially all of the assets. Following its failure to reach agreement with the Lenders, the Company determined that a sale of its assets, including the Customer List and the Customer Data (collectively, the "Assets") was in the best interests of the Company and its creditors.

23.     In June, when it became clear that a restructuring of the debt was not likely, the Company determined that a sale of its assets, including the Customer List and the Customer Data (collectively, the "Assets") was in the best interest of the Company and its creditors. Accordingly, after June 2009, the Company's primary effort was to find a buyer.

24.     As a principal of Dorman & Fawcett, I have advised various distressed companies in the sale of assets and have actively participated in identifying potential purchasers and negotiating sales.

25. Due to the substantial investment of time and technology involved in the collection and maintenance of the Customer Data as well as the intrinsic value of any customer list for any service or product, the Customer List is likely Verified's most valuable and saleable asset. Due, however, to the resources and expertise required to operate a network such as CLEAR, the market for Verified's business and the Customer List in particular is limited.

26. In marketing its Assets, the Company created a solicitation package including a nondisclosure agreement for interested parties to review and execute in connection with their investigation of the Company for sale purposes. A copy of the solicitation package is available for inspection.

27. The sale was complicated by the fact that the costs related to the review of the Company's records. Due to lack of resources and personnel, the Company was forced to store certain records in outside storage locations. The Customer Data was stored at Lockheed and was not available for review by potential purchasers due to the Company's privacy policies and regulations of the TSA and other governmental authorities. Costs to Lockheed to reactivate the network and transfer the Customer Data to a prospective purchaser (estimated at up to $250,000) also limits potential interested parties.

28. The Company has been marketing its Assets since March and aggressively marketing the assets since June 2009. Ten potential third party buyers executed nondisclosure agreements and reviewed the Company's books and records, and were involved in negotiations with the Company.

29. The Company most actively engaged in negotiations with WidePoint Corporation, Henry Incorporated ("Henry") andL-1 Identity Solutions, Inc. ("L-1"). Both Henry and L-1 presented proposed Asset Purchase Agreements to the Company and its Lender, negotiated the

terms of the Asset Purchase Agreements to eliminate or restructure contingencies to closing and to ensure the protection of the Customer Data in connection with a sale.

30. Ultimately, the Company decided to proceed with a sale to Henry, and executed the Henry Asset Purchase Agreement (the "Henry APA") on December 1, 2009. Pursuant to the Henry APA, Henry proposed to purchase the assets for the payment of $4,000,000 in cash, plus a warrant equal to ten percent (10%) of the stock in Henry, Inc. at the closing of the sale.

**Bankruptcy and Postpetition Efforts to Sell**

31. On December 1, 2009, Verified filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code with this Court.

32. On or about December 3, 2009, the Debtor filed the Sale Motion and the *Motion by Debtor For Approval of Bidding Procedures and Termination Fee Provision in connection with Debtor's Motion to Authorize Sale of Debtor's Assets by Private Sale Free And Clear of Liens, Claims And Interests*, which was approved by order the Court on December 23, 2009 (the "Bid Procedures Order").

33. In connection with the contemplated sale of its Assets and in the interests of protecting the privacy rights of its members with respect to the Customer List and the Customer Data, the Company filed, among other things, the *Motion by Debtor for Appointment of a Consumer Privacy Ombudsman* (the "Ombudsman Motion") seeking to appoint a consumer privacy ombudsman in accordance with Section 332 of the Bankruptcy Code, which was approved by an order of the Court dated January 7, 2010.

34. On January 8, 2010, the Office of the United States Trustee appointed Todd Ruback, Esquire of DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, P.C. as a consumer privacy ombudsman (the Ombudsman").

35. The Ombudsman has filed a report regarding the Company's privacy policies and the proposed sale of the Assets.

36. The Company also contemplates the filing of a certain *Motion by Debtor For Approval of Customer Notice Procedures and Termination Fee Provision in connection with Debtor's Motion to Authorize Sale of Debtor's Assets by Private Sale Free And Clear of Liens, Claims And Interests* (the "Customer Procedures Motion") to govern the transfer of the Customer Data to any prospective purchaser and corresponding notice to members. The Ombudsman has reviewed and contributed to the Customer Procedures Motion.

37. From and after December 1, 2009, I have remained in contact with various parties whom have expressed interest in the Assets, including in particular L-1, and have made available to prospective parties who executed the non-disclosure agreements, records of the Company and provided other information in my capacity as Verified's President.

38. I have made available to my counsel the lists of interested parties for the purposes of service of sale materials, including the Sale Motion and accompanying Notice of Sale, including the following interested parties referred who executed non-disclosure agreements:

Bain Capital
Boston Office
111 Huntington Avenue
Boston, MA  02199

H.I.G. Ventures
Attn: Fred Sturgis
1001 Brickell Bay Drive, 27th Floor
Miami, FL 33131

Oak Investment Partners
Attn: Ren Riley
525 University Avenue, Suite 1300
Palo Alto, CA  94301

Valhalla Partners
8000 Towers Crescent Drive
Suite 1050
Vienna, VA  22180

The Carlyle Group
Robert Grady
11100 Santa Monica Boulevard
Los Angeles, CA 90025

RHO Capital Partners
Attn: H. Kairouz
525 University Avenue, Suite 1350
Palo Alto, CA  94301

Columbia Capital
Attn. Jason Booma , John Siegel , Jim Fleming
201 North Union Street, Suite 300
Alexandria, VA 2231

Spectrum Equity Investors
Attn: Vic Parker
One International Place, 29th Floor
Boston, MA  02110

TPG Growth Offices
David Ibnale
345 California Street, Suite 3300
San Francisco, CA  94104

Daon
11955 Freedom Drive, Suite 16000
Reston, VA  20190

Bertram Capital Management LLC
800 Concar Drive, Suite 100
San Mateo, CA  94402

Operational Research Consultants, Inc.
11250 Waples Mill
South Tower, Suite 210
Fairfax, VA 22030

Wide Point
11250 Waples Mill Road, Suite 210
Fairfax, VA  22030

Xpresspa
Attn: Morton Binn
620 West Field Road
San Francisco, CA 94128-3101

39. The Notice of Sale and Bid Procedures Order have been served on all such parties.

40. The Company also caused to be published a notice of sale of the Assets in the Wall Street Journal. An affidavit from the Wall Street Journal evidencing publication of that notice of sale in the national edition of the Wall Street Journal and on the World Wide Web is attached to this affidavit as Exhibit A.

41. In my experience as a financial advisor, it is my opinion that the Company has made every effort to identify potential buyers, solicit bids and make available the resources necessary to market and sell the Assets.

42. On or about January 27, 2010, in accordance with the Bid Procedures Order, Alclear, LLC, a financial partner of L-1 ("Alclear"), submitted a bid for the purchase of the Assets for the amount of $4,350,000 plus "profit interests" in Alclear representing ten-percent of the initial equity interests in Alclear.

43. I have no connection with any of Henry, L-1, Alclear or any other potential purchaser of the Assets.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 1st day of February, 2010

*/s/ James E. Moroney*
James E. Moroney

::ODMA\PCDOCS\DOCS\552909\1