**Exhibit A to**

*Order regarding Debtor's Motion (a) to Authorize Debtor to Effectuate Asset Purchase Agreement with Henry, Inc.; (b) to Authorize Sale of Certain of the Debtor's Assets by Private Sale Free and Clear of Liens, Claims and Interests; and (C) for Related Relief*

**ASSET PURCHASE AGREEMENT**

**BETWEEN**

**VERIFIED IDENTITY PASS, INC.**

**AND**

**ALCLEAR, LLC**

**January 27, 2010**

# TABLE OF CONTENTS

1. Definitions ............................................................................................................................. 1

2. Basic Transaction ................................................................................................................. 6
    2.1     Purchase and Sale of Assets ................................................................................. 6
    2.2     Assumption of Liabilities ..................................................................................... 6
    2.3     Purchase Price ....................................................................................................... 7
    2.4     The Closing ........................................................................................................... 7
    2.5     Deliveries at the Closing ...................................................................................... 7
    2.6     Allocation ............................................................................................................. 8

3. Representations and Warranties of the Seller ..................................................................... 8
    3.1     Organization, Qualification and Power ............................................................... 8
    3.2     Authorization of Transaction ............................................................................... 8
    3.3     Noncontravention ................................................................................................. 8
    3.4     Brokers' Fees ........................................................................................................ 8
    3.5     Title to Acquired Assets ...................................................................................... 8
    3.6     Intellectual Property............................................................................................. 9
    3.7     Customer Data ...................................................................................................... 9
    3.8     Disclaimer ............................................................................................................ 9

4. Representations and Warranties of the Buyer.................................................................... 9
    4.1     Organization of the Buyer ................................................................................. 10
    4.2     Authorization of Transaction ............................................................................. 10
    4.3     Noncontravention ............................................................................................... 10
    4.4     Brokers' Fees ...................................................................................................... 10

5. Pre-Closing Covenants ...................................................................................................... 10
    5.1     General ................................................................................................................ 10
    5.2     Notices and Consents ......................................................................................... 10
    5.3     Operation of Business ........................................................................................ 11
    5.4     Full Access .......................................................................................................... 13
    5.5     Notice of Developments ..................................................................................... 13
    5.6     Further Assurances ............................................................................................. 13
    5.7     GOAA .................................................................................................................. 13
    5.8     Bankruptcy Covenants........................................................................................ 13

6. Post-Closing Covenants...................................................................................................... 15

6.1     General ................................................................................. 15
6.2     Transition ............................................................................. 15
6.3     Confidentiality ...................................................................... 15
6.4     Non-competition, Non-solicitation, Non-disparagement ................ 16
6.5     Customer Data Transfer and Destruction ................................. 17

7. Conditions to Obligation to Close ................................................. 17
7.1     Conditions to Obligation of the Buyer ................................... 17
7.2     Conditions to Obligation of the Seller ................................... 19

8. Termination ............................................................................... 20
8.1     Termination of Agreement ................................................... 20
8.2     Effect of Termination .......................................................... 20

9. Miscellaneous ........................................................................... 21
9.1     Press Releases and Public Announcements ............................ 21
9.2     No Third-Party Beneficiaries ............................................... 21
9.3     Entire Agreement ............................................................... 21
9.4     Succession and Assignment ................................................ 21
9.5     Counterparts ..................................................................... 21
9.6     Headings ........................................................................... 21
9.7     Notices ............................................................................. 21
9.8     Governing Law ................................................................. 22
9.9     Amendments and Waivers ................................................... 22
9.10     Severability ................................................................... 23
9.11     Expenses ...................................................................... 23
9.12     Construction ................................................................. 23
9.13     Incorporation of Exhibits and Schedules ........................... 23
9.14     Specific Performance ..................................................... 23
9.15     Submission to Jurisdiction .............................................. 23

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**") is dated as of January 27, 2010, by and between Alclear, LLC, a Delaware limited liability company (the "**Buyer**"), and Verified Identity Pass, Inc., a Delaware corporation (the "**Seller**"). The Buyer and the Seller are referred to collectively as the "**Parties**."

## RECITALS

**WHEREAS**, the Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on December 3, 2009 (the "**Bankruptcy Case**");

**WHEREAS**, on December 1, 2009, Seller entered into an Asset Purchase Agreement (the "**Henry Agreement**") with Henry Incorporated ("**Henry**"), pursuant to which Seller agreed to sell to Henry certain assets of Seller more fully described in the Henry Agreement, subject to approval of the Bankruptcy Court, subject to higher or better offers;

**WHEREAS**, on December 23, 2009, the Bankruptcy Court issued the Bidding Procedures Order setting forth Bidding Procedures in connection with the sale of Seller's assets;

**WHEREAS**, upon the terms and subject to the conditions set forth herein and as authorized under Sections 105, 363, and 365 of the Bankruptcy Code, Buyer desires to purchase from the Seller, and the Seller desires to sell to Buyer, those assets of the Seller more fully described herein in exchange for the payment to the Seller of the Purchase Price and the assumption by the Buyer of the Assumed Liabilities; and

**WHEREAS**, the transactions contemplated by this Agreement (the "**Transactions**") are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order (as defined below) to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code.

## AGREEMENT

In consideration of the above recitals and the promises set forth in this Agreement, the Parties agree as follows:

1. **Definitions**.

   "**Acquired Assets**" means all of Seller's right, title and interest, if any, in, to and under all of the assets of the Seller that are listed on Schedule 1 hereto, which Schedule may be updated, amended or modified by the Buyer in its sole discretion prior to Closing.

   "**Action**" has the meaning set forth in the Sale Approval Order.

"**Affiliate**" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act.

 "**Agreement**" has the meaning set forth in the preface.

"**Assignment Order**" has the meaning set forth in Section 5.8(a).

"**Assumed Liabilities**" means the following Liabilities (but excluding the Excluded Liabilities): all obligations of the Seller including cure costs under the agreements, contracts, leases, licenses and other arrangements set forth on Schedule 1 hereto (which Schedule may be updated, amended or modified by the Buyer in its sole discretion prior to Closing) either (i) to furnish goods, services and other non-Cash benefits to another party after the Closing; or (ii) to pay for goods, services and other non-Cash benefits that another party will furnish to it after the Closing.

"**Back-up Bid**" has the meaning ascribed to such term in the Bidding Procedures.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bankruptcy Case**" has the meaning set forth in the recitals.

"**Bidding Procedures**" means those procedures described in the Bidding Procedures Order.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court, dated December 23, 2009 pursuant to 11 U.S.C. §§ 105, 363, and 1146(c), and Fed. R. Bankr. P. 2002, 6004 and 6006 (a) establishing competitive bidding procedures in connection with the sale of substantially all of the Seller's assets, (b) approving bid protections, including break-up fee and expense reimbursement, (c) scheduling an auction and sale hearing and establishing objection deadline with respect to approval of sale and (d) authorizing and approving form and manner of notice of bidding procedures and sale hearing.

"**Break-Up Fee**" means the amount of $120,000 payable by Seller to Henry, pursuant to the Henry Agreement.

"**Business**" means the business of providing customers fast-lane airport security service.

"**Buyer**" has the meaning set forth in the preface.

"**Buyer Note**" means the senior secured note issued by Buyer in the principal amount of $1 million, on the terms attached hereto as <u>Exhibit B</u>, the final terms of which shall be reasonably acceptable to the Collateral Agent.

"**Closing**" has the meaning set forth in Section 2.5.

"**Closing Date**" has the meaning set forth in Section 2.5.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidential Information**" means any information concerning the business and affairs of the Seller or the Buyer, as applicable, that is not already generally available to the public.

"**Credit Period**" has the meaning set forth in Section 5.2(c).

"**Customer**" means (i) any current or former customer of the Company, and (ii) any current or former customer applicant whose data has been submitted to the Company but not yet processed.

"**Customer Data**" means (i) any and all personal and biographical data, including name, address, email address, phone number, nationality, credit card number, birth date and any other personal descriptive data of any Customer; (ii) any and all biometric data, including fingerprint and iris scan data of any Customer; and (iii) any and all personal and biographical data of any current or former customer applicant whose data has been submitted to the Company but not yet processed, in each case, which is stored and maintained by or at the direction of the Seller.

"**Customer Usage Data**" means any and all non-personally-identifiable data relating to number, date, time, frequency or location of verifications, or any other non-personally-identifiable data of Customers used to evaluate or manage the business stored and maintained by or at the direction of the Seller.

"**Denial Deadline**" has the meaning set forth in Section 5.2(b).

"**Escrow Agent**" has the meaning set forth in Section 2.3(b).

"**Escrow Agreement**" means the escrow agreement among the Buyer, the Seller and the Escrow Agent, in the form attached hereto as Exhibit A.

"**Excluded Assets**" means: (a) the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, blank stock certificates and other documents relating to the organization, maintenance and existence of the Seller as a corporation; (b) any of the rights of the Seller under this Agreement (or under any side agreement between the Seller and the Buyer entered into on or after the date of this Agreement); (c) any membership agreements with Customers; and (d) any assets of the Seller that are not Acquired Assets.

"**Excluded Liabilities**" means: (a) any Liability of the Seller for Taxes; (b) any Liability of the Seller for the unpaid Taxes of any Person (other than the Seller) under Reg. Section 1.1502-6 (or any similar provision of Law), as a transferee or successor, by contract, or otherwise; (c) any obligation of the Seller to indemnify any Person by reason of the fact that such Person was a director, officer, employee or agent of the Seller or was

serving at the request of the entity as a partner, trustee, director, officer, employee or agent of another entity (whether such indemnification is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses or otherwise and whether such indemnification is pursuant to any Law, charter document, bylaw, agreement or otherwise); (d) any Liability of the Seller for costs and expenses incurred in connection with this Agreement and the contemplated transactions; (e) any Liability or obligation of the Seller under this Agreement (or under any side agreement between the Seller and the Buyer entered into on or after the date of this Agreement); (f) any Liability or obligation under any Excluded Assets; and (g) any other obligation or Liability of the Seller, its Affiliates or any other Person not specifically included within the definition of Assumed Liabilities.

"**Expense Reimbursement**" means the amount of up to $150,000 payable by Seller to Henry, pursuant to the Henry Agreement as modified by the Bid Procedures Order.

"**GOAA**" means the Greater Orlando Aviation Authority**.**

"**GOAA Escrow**" has the meaning set forth in Section 2.3(b).

"**Governmental Authority**" means (a) any federal, state, local or foreign governmental, administrative or regulatory authority, court, agency or body, or any division or subdivision, (b) any arbitration board, tribunal or mediator, or (c) any airport or special district authority.

"**Henry**" has the meaning set forth in the recitals.

"**Henry Agreement**" has the meaning set forth in the recitals.

"**Indemnified Party**" has the meaning set forth in Section 8.4.

"**Indemnifying Party**" has the meaning set forth in Section 8.4.

"**Intellectual Property**" means: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements, and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations; (b) all trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations, adaptations, derivations and combinations and including all associated goodwill, and all applications, registrations and renewals; (c) all copyrightable works, all copyrights and all applications, registrations and renewals; (d) all mask works and all applications, registrations and renewals in connection therewith; (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (f) all computer software (including data

and related documentation); (g) all other proprietary rights; and (h) all copies and tangible embodiments (in whatever form or medium).

"**Knowledge of the Seller**" means, with respect to the Seller, actual knowledge of any employee, officer and directors of the Seller after reasonable investigation and knowledge that could have been obtained through reasonable inquiry.

"**Law**" means any federal, state, local or foreign constitution, law, code, plan, statute, rule, regulation, ordinance, order, writ, injunction, ruling, judgment, decree, charge, restriction or Permit of any Governmental Authority, each as amended and in effect, now or in the future.

"**Lender Lien**" shall mean any and all liens or other encumbrances arising under or in connection with that certain Secured Credit Agreement dated as of December 21, 2006 among the Seller, as borrower, the lenders signatory thereto (the "**Lenders**"), Morgan Stanley Senior Funding, Inc., solely in its capacity as administrative agent for the lenders ("**MSSF**") and as syndication agent, and Morgan Stanley & Co. Incorporated, solely in its capacity as collateral agent (the "**Collateral Agent**").

"**Liability**" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"**Material Adverse Effect**" means any change or affect that is reasonably likely to be materially adverse to the business, operation, properties, financial condition, assets, Liabilities (including without limitation contingent Liabilities) or prospects of an entity or its Subsidiaries, individually or collectively.

"**Notice Deadline**" has the meaning set forth in Section 5.2(b).

"**Ordinary Course of Business**" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"**Orlando Assets**" has the meaning ascribed to such term in the Sale Approval Order.

"**Parties**" has the meaning set forth in the preface.

"**Permits**" means any permits, authorizations, approvals, decisions, zoning orders, franchises, registrations, licenses, filings, certificates, variances or similar rights granted by or obtained from any Governmental Authority that Seller has the legal authority to transfer.

"**Person**" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Authority.

"**Purchase Price**" has the meaning set forth in Section 2.3.

"**Sale Approval Order**" has the meaning set forth in Section 5.8(a).

"**Securities Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Security Interest**" means any mortgage, pledge, lien, encumbrance, claim, charge or other security interest.

"**Seller**" has the meaning set forth in the preface.

"**Seller's Knowledge**" means the knowledge of any officer or director of Seller and such knowledge that would be imputed to such persons upon due inquiry.

"**Subsidiary**" means any corporation, partnership, limited liability company or other entity in which any Person has direct or indirect equity or ownership interest that represents fifty percent (50%) or more of the aggregate equity or ownership interest in such entity, or has the power to vote or direct the voting of sufficient securities to elect a majority of the directors or governors.

 "**Tax**" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition, whether disputed or not.

 "**Third Party Claim**" has the meaning set forth in Section 8.4.

"**Transaction Documents**" means all documents and agreements to be entered into by one or more of the Parties in connection with the transactions contemplated by this Agreement.

"**Transactions**" has the meaning set forth in the recitals.

2. **Basic Transaction**.

2.1 **Purchase and Sale of Assets**.  On the terms and subject to the conditions of this Agreement, the Buyer agrees to purchase from the Seller, and the Seller agrees to sell, transfer, convey and deliver to the Buyer, the Acquired Assets, free and clear of all security interests, liens, claims, charges, restrictions or encumbrances of any kind, at the Closing in exchange for the Purchase Price.

2.2 **Assumption of Liabilities**.  On the terms and subject to the conditions of this Agreement, the Buyer agrees to assume and become responsible for the Assumed

Liabilities at the Closing.  The Buyer will not, however, assume or otherwise be obligated for the Excluded Liabilities.

2.3    **Purchase Price**.  The purchase price for the Acquired Assets shall be $5,870,000 plus the Buyer Note (collectively, the "**Purchase Price**") payable as follows:

(a)    Deposit.  Upon submission of this Agreement to the Seller in accordance with the Bidding Procedures Order, the Buyer shall deliver to the Seller a deposit of $50,000, by wire transfer of immediately available funds.  This deposit shall be applied toward the Purchase Price due at Closing.  If this Agreement is terminated or it is determined that Buyer is not the winning bidder in the Auction, then the Seller shall immediately return the $50,000 deposit in full to the Buyer by wire transfer of immediately available funds.

(b)    Cash.  Upon the entry of the Sale Approval Order by the Bankruptcy Court, Buyer promptly shall deposit the sum of (i) $5,320,000 into an escrow account with J.P. Morgan & Co. (the "**Escrow Agent**"), to be managed and paid out at Closing by the Escrow Agent pursuant to the terms of the Escrow Agreement, to the Seller, to be held by the Seller pursuant to the terms of the Sale Approval Order in exchange for the Collateral Agent agreeing to release the Lender Lien, and (ii) $500,000 into a separate escrow account with the Escrow Agent (the "**GOAA Escrow**") to satisfy any payment obligations of the Seller upon resolution of the Action against GOAA pursuant to the terms of the Sale Approval Order, to be managed and paid out by the Escrow Agent pursuant to the terms of the Escrow Agreement.

(c)    Buyer Note.  At Closing, the Collateral Agent shall release the Lender Lien, and Buyer will deliver to the Seller the Buyer Note, to be held by the Seller pursuant to the terms of the Sale Approval Order.

2.4    **The Closing**.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY, at such time and date as the Parties may determine on or before the 30th day after the entry of the Sale Approval Order (the "**Closing Date**").

2.5    **Deliveries at the Closing**.  At the Closing:  (a) the Seller will execute, acknowledge (if appropriate) and deliver to the Buyer any certificates, instruments and documents, including those referred to in Section 7.1 below, as the Buyer and its counsel may reasonably request; (b) the Buyer will execute, acknowledge (if appropriate) and deliver to the Seller any certificates, instruments and documents, including those referred to in Section 7.2 below, as the Seller and its counsel may reasonably request; and (c) the Buyer will deliver the Purchase Price.

2.6 **Allocation**.  The Parties shall use such allocation of the Purchase Price as the Parties may agree upon in writing after the date hereof; provided, however, that if the Parties are unable to agree upon allocation of the Purchase Price, each Party shall be entitled to file its own Internal Revenue Service ("**IRS**") Form 8594 allocating the Purchase Price, as such Party may believe is appropriate; provided further that in the event the Parties cannot agree upon the allocation hereunder, each Party shall provide a duplicate copy of its IRS Form 8594, as submitted to the IRS, to the other Party hereto within ten (10) days of filing such form.

3. **Representations and Warranties of the Seller**.  The Seller represents and warrants to the Buyer that the statements contained in this Section 3 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date.

3.1 **Organization, Qualification and Power**.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

3.2 **Authorization of Transaction**.  Other than the required shareholder approval of the Seller which the Seller will obtain by Closing, the Seller has full corporate power and authority to enter into and perform its obligations under this Agreement and the Transaction Documents to which it is a party.  The board of directors of the Seller has duly authorized the execution, delivery and performance of this Agreement and the Transaction Documents to which the Seller is a party.  This Agreement and the Transaction Documents to which the Seller is a party constitute valid and legally binding obligations of the Seller, enforceable in accordance with their respective terms and conditions.

3.3 **Noncontravention**.  Neither the execution and the delivery of this Agreement or the Transaction Documents to which the Seller is a party, nor the consummation of the contemplated transactions:  (a) will violate any Law to which the Seller is subject; (b) will violate any provision of the articles, bylaws or other organizational documents of the Seller; or (c) other than as provided herein, requires the Seller to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement and the Transaction Documents.

3.4 **Brokers' Fees**.  The Seller does not have any Liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which the Buyer could become liable or obligated.

3.5 **Title to Acquired Assets**.  Except for those certain contracts set forth on Schedule 1 hereto that are not transferable under Section 365 of the Bankruptcy Code or require the consent of the applicable third party, the Seller (i) has good and valid title to the Acquired Assets and (ii) will transfer to Buyer at Closing the Acquired Assets free and clear of all Security Interests, subject in both clause (i)

and (ii) to those Security Interests which are a matter of record and those asserted by various municipal authorities, including the ownership interest asserted by the GOAA, or by other third parties storing the Acquired Assets.

3.6     **Intellectual Property**.  Seller exclusively owns free and clear of all Liens, the name and trademark "Clear" and the domain name and website flyclear.com.  No claims are pending against Seller before a Governmental Authority or, to the Knowledge of the Seller, threatened, with regard to the ownership by Seller of the "Clear" name or the domain name and website flyclear.com.

3.7     **Customer Data**.  Seller has Customer Data and Customer Usage Data for each Customer set forth in that certain May 2009 monthly dashboard report contained in the June 10, 2009, board of directors presentation, which Customer Data and Customer Usage Data, to the best of Seller's Knowledge, was true, accurate and complete as of the date thereof.  Such Customer Data and Customer Usage Data will be transferred to Buyer in accordance with the terms and conditions set forth herein, subject to the ownership interest asserted by the GOAA.

3.8     **Disclaimer**.  NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE BUYER UNDERSTANDS AND AGREES THAT THE SELLER IS NOT MAKING ANY REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS, IMPLIED, AT COMMON LAW, STATUTORY OR OTHERWISE, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN, AND THE BUYER FURTHER UNDERSTANDS AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED HEREIN, THE ACQUIRED ASSETS ARE BEING ACQUIRED "AS IS, WHERE IS" "WITH ALL FAULTS", AND THAT THE BUYER IS RELYING ON ITS OWN EXAMINATION OF SUCH ASSETS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS SECTION 3, THE BUYER UNDERSTANDS AND AGREES THAT THE SELLER EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AT COMMON LAW, STATUTORY, OR OTHERWISE AND ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.  THE BUYER AGREES THAT, EXCEPT AS PROVIDED IN THIS AGREEMENT, NO INFORMATION, MATERIAL OR COMMUNICATION PROVIDED OR MADE BY THE SELLER OR ANY REPRESENTATIVE OF THE SELLER SHALL CONSTITUTE, CREATE OR OTHERWISE CAUSE TO EXIST ANY REPRESENTATION OR WARRANTY OTHERWISE DISCLAIMED BY THE FOREGOING.

4.     **Representations and Warranties of the Buyer**.  The Buyer represents and warrants to the Seller that the statements contained in this Section 4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date.

4.1 **Organization of the Buyer**.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Buyer is duly authorized to conduct business and is in good standing under the Laws of each jurisdiction where such qualification is required.

4.2 **Authorization of Transaction**.  The Buyer has full corporate power and authority to enter into and perform its obligations under this Agreement and the Transaction Documents to which it is a party.  The sole managing member of the Buyer has duly authorized the execution, delivery and performance of this Agreement and the Transaction Documents to which the Buyer is a party. This Agreement and the Transaction Documents to which it is a party constitute valid and legally binding obligations of the Buyer, enforceable in accordance with their respective terms and conditions.

4.3 **Noncontravention**.  Neither the execution and the delivery of this Agreement or the Transaction Documents to which the Buyer is a party, nor the consummation of the contemplated transactions: (a) will violate any Law to which the Buyer is subject; (b) will violate any provision of the articles, bylaws or other organizational documents of the Buyer; or (c) require the Buyer to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement and the Transaction Documents.

4.4 **Brokers' Fees**.  The Buyer has no Liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which the Seller could become liable or obligated.

5. **Pre-Closing Covenants**.  The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing.

5.1 **General**.  Each of the Parties will use its reasonable best efforts to take all action and to do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Section 7 below); provided, however, that Seller shall not  make any payment to, or promise to pay, any third party without the Buyer's prior written consent thereto.

5.2 **Notices and Consents**.

(a) The Seller will give any notices to third parties, and the Seller will use its reasonable best efforts, at Buyer's sole cost and expense, to obtain any third party consents that are necessary or that the Buyer reasonably may request, in connection with the transactions contemplated by this Agreement.  Each of the Parties will give any notices to, make any filings with and use its reasonable best efforts to obtain any authorizations,

Permits, consents and approvals of any Governmental Authority necessary in connection with the transactions contemplated by this Agreement at the Buyer's sole cost and expense. The form and content of any such notices or requests shall be mutually acceptable to the Buyer and the Seller.

(b)     As soon as practicable after the date of the entry of the Sale Approval Order (the "**Notice Deadline**"), Seller will cause Lockheed Martin, or such other service provider as Buyer shall designate, to provide electronic notice to each Customer of the sale, the proposed transfer of the Customer Data to the Buyer and the opportunity for each Customer to elect to have his or her Customer Data destroyed rather than be transferred to the Buyer. The content of any notices sent to any Customers will be mutually agreed upon by the Seller and the Buyer and neither the Seller nor Lockheed Martin shall send any notices to, or contact, any current or former Customer without the prior written consent of Buyer. No Customer Data shall be transferred to the Buyer until the notice has been sent and Customers have been provided with an opportunity to elect to have their Customer Data destroyed. Customers shall have until 9:00 a.m., New York City time on the 30th day after the Notice Deadline (the "**Denial Deadline**") to respond. Any customer who does not respond by the Denial Deadline will be deemed to have consented to the transfer of the Customer Data to the Buyer. For any Customer who indicates by the Denial Deadline that he or she does not want the data transferred, that Customer's Customer Data shall not be transferred to Buyer. All other Customer Data (other than Customer Data of Customers who have successfully opted-out prior to the Denial Deadline), and all Customer Usage Data, shall be transferred to the Buyer.

(c)     In connection with sending opt-out notices to Customers of the Seller, the Buyer will (i) offer to each Customer the opportunity to participate in a new plan of service, and for each Customer who accepts the offer, Buyer will offer credit to each such Customer of such number of months of service equal to the number of months that remained in such Customer's original membership agreement with Seller at the time that Seller ceased operations on June 24, 2009 (the "**Credit Period**"), and (ii) notify Customers that Buyer will not charge any such Customer any subscription fee for use of the Buyer's service unless such Customer accepts a plan of service offered by the Buyer.

(d)     In addition to the provisions in this Section 5.2, the Seller and the Buyer shall cooperate with the consumer privacy ombudsman appointed by the Bankruptcy Court pursuant to the Order Regarding Debtor's Motion for the Appointment of a Consumer Privacy Ombudsman, dated January 6, 2010, with respect to the transfer of the Customer Data.

5.3     **Operation of Business**. The Seller will not, without the prior written consent of the Buyer, engage in any practice, take any action or enter into any transaction

outside the Ordinary Course of Business. Without limiting the foregoing, the Seller will not, without the prior written consent of the Buyer, do any of the following:

(a) sell, lease (as lessor), transfer or otherwise dispose of any material assets of the Seller, or encumber, pledge, mortgage or suffer to be imposed on any of the material assets of the Seller any Security Interests;

(b) affirmatively amend or terminate any agreement identified in Schedule 1 or any Permit other than as may be required in connection with transferring the rights or obligations under such agreement or Permit to the Buyer pursuant to this Agreement;

(d) make any capital expenditures or enter into a capital commitment with respect thereto;

(e) amend or otherwise change its articles, bylaws or other organizational documents;

(f) acquire (including, without limitation, by merger, consolidation or acquisition of stock or assets) any corporation, partnership or other business organization or division or any material amount of assets; incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any Person, or make any loans or advances; or enter into or amend a contract, agreement, commitment or arrangement with respect to any matter set forth in this paragraph (f);

(h) hire any employees, increase the compensation payable or to become payable to, or grant any severance or termination pay to, its officers, directors or consultants, if any, or enter into any employment, consulting or severance agreement with, any director, officer or other employee or consultant of the Seller, or establish, adopt, enter into or amend any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement (including any employee benefit plan) for the benefit of any director, officer, employee or consultant;

(j) declare, set aside or pay any dividend or make any distribution with respect to its capital stock or redeem, purchase or otherwise acquire any of its capital stock;

(k) commence or settle any litigation; or

(l) except for payments of Hanify & King's and Dorman & Fawcett's reasonable fees in connection with services rendered to the Seller, pay any

amount to any third party with respect to any Liability or obligation (including any costs and expenses the Seller has incurred or may incur in connection with this Agreement and the contemplated transactions) that would not constitute an Assumed Liability if in existence as of the Closing.

5.4     **Full Access**.  The Seller will permit representatives of the Buyer to have full access, at all reasonable times, and in a manner so as not to interfere with the normal business operations of the Seller, to all premises, properties, personnel, books, records (including Tax records), contracts and documents of or pertaining to the Seller.

5.5     **Notice of Developments**.  Each Party will give prompt written notice to the other Party of any development causing a breach of any of its own representations and warranties in Section 3 and Section 4 above.  No disclosure by any Party pursuant to this Section 5.5, however, shall prevent or cure any misrepresentation, breach of warranty or breach of covenant.

5.6     **Further Assurances**. Subject to the other provisions of this Agreement, each of Buyer and Seller shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

5.7     **GOAA**.  Promptly upon entry of the Sale Approval Order, and in any event no later than 30 days after the entry of the Sale Approval Order, unless otherwise agreed in writing with Buyer, Seller shall (i) pay, or deliver instructions to the Escrow Agent to pay, the full amount of the GOAA Escrow over to Buyer; (ii) commence an Action in the Bankruptcy Court against GOAA, at Seller's sole cost and expense (provided, however, that Seller shall not be liable for any costs or expenses of Buyer in connection with such Action), requesting that the Bankruptcy Court determine the extent, if any, of the ownership interest asserted by GOAA in certain Acquired Assets (including the Orlando Assets); or (iii) subject to compliance with the following sentence of this section, enter into a settlement or compromise with GOAA relating to the ownership of Customers up to 55,064. The Seller shall not enter into any settlement or compromise or consent to the entry of any judgment or order with respect to the Action, without the prior written consent of Buyer, which shall not unreasonably be withheld; <u>provided</u>, that, the consent of Buyer shall not be required if such settlement, compromise or consent to judgment relates solely to the issue of the ownership of Customers by GOAA up to 55,064.

5.8     **Bankruptcy Covenants**.

(a)     For purposes of this Agreement, "**Sale Approval Order**" shall mean the order of the Bankruptcy Court entered pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, which is not subject to a stay or injunction, in

form acceptable to the Buyer, (i) approving this Agreement and the transactions contemplated hereby and all the terms and conditions hereof, and approving and authorizing the Seller to consummate the Transactions; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Security Interests pursuant to Section 363(f) of the Bankruptcy Code, (iii) finding that Buyer is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (iv) confirming that Buyer is acquiring the Acquired Assets free and clear of the Excluded Assets and the Excluded Liabilities; (v) providing that this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions; (vi) providing that the provisions of Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of execution of the Sale Approval Order under Rule 62(a) of the Federal Rules of Civil Procedure; and (vii) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement.

(b)      For purposes of this Agreement, "**Assignment Order**" shall mean an order of the Bankruptcy Court authorizing the assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the unexpired leases of leased real property and of personal property and executory contracts and other agreements, each as set forth on Schedule 1 (which Schedule may be updated, amended or modified by the Buyer in its sole discretion prior to Closing) or hereafter designated by Buyer in its sole discretion before Closing by notice to Seller as a contract to be acquired ("**Acquired Contracts**").  The Seller shall identify the Acquired Contracts on an exhibit to the Assignment Motion.  Such exhibit shall set forth the amounts necessary to cure defaults under each of such Acquired Contracts as determined by Seller based on Seller's books and records.  In situations in which Seller is unable to establish that a default exists based upon a review of its books and records, or other relevant information, the relevant cure amount shall be set at $0.00.  Buyer agrees to cooperate with Seller in connection with furnishing information pertaining to the satisfaction of the requirement of adequate assurances of future performance as required under Section 365(f)(2)(B) of the Bankruptcy Code.  The Assignment Order, including any exhibits thereto, shall be in form and substance satisfactory to the Buyer in its reasonable discretion.

(c)      Seller shall obtain the Sale Order and the Assignment Order from the Bankruptcy Court.  In the event the entry of the Sale Order or the Assumption Order shall be appealed, Seller and Buyer shall use their respective reasonable efforts to diligently defend such appeal and use their respective reasonable efforts to obtain and expedited resolution of any such appeal, petition, or motion.  Seller shall promptly make any filings, take all actions, and use its best efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the Transactions

contemplated hereby, subject to its obligations to comply with any order of the Bankruptcy Court.  In the event of any inconsistencies between the Sale Approval Order and any provisions of this Agreement, the terms of the Sale Approval Order shall govern.

(d)     Seller will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications and supporting papers prepared by Seller prior to the filing thereof with the Bankruptcy Court.  All motions, applications and supporting papers prepared by Seller and relating (directly or indirectly), in Buyer's good faith determination, to the transactions contemplated by this Agreement (including forms of orders and notices to interested parties) must be acceptable in form and substance to Buyer, in its reasonable discretion.  In the event an appeal is taken, or a stay pending appeal is requested, from the Sale Order or the Assignment Order, Seller shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer within one Business Day a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

6.      **Post-Closing Covenants**.  The Parties agree as follows with respect to the period following the Closing.

6.1     **General**.  For a period of three (3) months after the Closing, in the event any further action is necessary or desirable to carry out the purposes of this Agreement, the Transaction Documents and the contemplated transactions, each of the Parties will take such further action (including the execution and delivery of further instruments and documents) as the other Party reasonably may request. The requesting Party will pay all reasonable out-of-pocket expenses in connection with the foregoing.

6.2     **Transition**.  For a period of three (3) months following the Closing, the Seller will not take any action that is designed or intended to have the effect of discouraging any lessor, licensor, Customer, supplier or other business associate of the Seller from maintaining the same business relationships with the Buyer after the Closing as it maintained with the Seller prior to the Closing.  The Seller will refer all Customer inquiries relating to the Business to the Buyer from and after the Closing.

6.3     **Confidentiality**.  Each Party will treat and hold as such all of the Confidential Information of the other Party, refrain from using any of the Confidential Information of the other Party except in connection with this Agreement, and deliver promptly to the other Party or destroy, at the request and option of the other Party, all tangible embodiments (and all copies) of the Confidential Information of the other Party that are in its possession.  In the event that a Party is requested or required (by oral question or request for information or documents

in any legal proceeding, interrogatory, subpoena, civil investigative demand or similar process) to disclose any Confidential Information of the other Party, the first Party will notify the other Party promptly of the request or requirement so that the other Party may seek an appropriate protective order or waive compliance with the provisions of this Section 6.3.  If, in the absence of a protective order or the receipt of a waiver, a Party is, on the advice of counsel, compelled to disclose any Confidential Information of the other Party to the tribunal or else stand liable for contempt, the  first Party may disclose the Confidential Information to the tribunal.  The disclosing party must use its reasonable best efforts to obtain, at the reasonable request of the other Party, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information of the other Party required to be disclosed as the other Party shall designate.

6.4     **Non-competition, Non-solicitation, Non-disparagement** .

(a)     To further ensure that the Buyer receives the expected benefits of acquiring the Acquired Assets, the Seller agrees that, throughout the period that begins at the Closing and ends on the fifth anniversary of the Closing Date (the "**Non Compete Period**"), the Seller will not directly or indirectly,

(i)     own, operate, invest in, lend money to, consult with, render services to, act as agent for, or acquire or hold any interest in, any Person that engages in the Business within the United States, except that nothing herein prohibits Seller or any Affiliate of Seller from owning or holding less than 1% of the outstanding shares of any class of stock that is regularly traded on a recognized domestic or foreign securities exchange or over the counter market;

(ii)    employ or attempt to employ any individual who is now or later becomes a director, officer or employee of the Buyer or otherwise interfere with or disrupt any such employment relationship (contractual or other) of the Buyer, except that nothing herein prohibits the Seller or any Affiliate of Seller from any general solicitation for employment (including in any newspaper or magazine, over the internet or by any search or employment agency) if not specifically directed towards any employee of the Buyer;

(iii)   solicit, request, advise or induce any then current or potential customer, supplier or other business contact of the Buyer to cancel, curtail or otherwise adversely change its business or relationship with the Buyer; and

(iv)    criticize or disparage in any manner or by any means (whether written or oral, express or implied) the Buyer or any aspect of the

Buyer's management, policies, operations, products, services, practices or personnel.

(b)     The Seller specifically acknowledges and agrees that (1) this Section 6.4 is reasonable and necessary to ensure that the Buyer receives the expected benefits of acquiring the Acquired Assets, (2) the Buyer has refused to enter into this Agreement in the absence of this Section 6.4 and (3) breach of this Section 6.4 will harm the Buyer to such an extent that monetary damages alone would be an inadequate remedy.  Therefore, in the event of a breach by the Seller of this Section 6.4, (A) the Buyer (in addition to all other remedies the Buyer may have) will be entitled to a temporary restraining order, injunction and other equitable relief (without posting any bond or other security) restraining the Seller from committing or continuing such breach and (B) the duration of the Non Compete Period will be extended beyond its then scheduled termination date for a period equal to the duration of such breach.

6.5     **Customer Data Transfer and Destruction** .  With respect to any Customer Data that is not transferred to the Buyer as a result of a Customer affirmatively opting-out of the data transfer to Buyer by the Denial Deadline, the Parties agree that such Customer Data with respect to such Customer shall be destroyed by Seller 30 days after the Denial Deadline, unless, if permissible, prior to the date of destruction, the Buyer obtains the affirmative consent of the Customer to transfer his or her Customer Data, then such Customer Data shall be transferred immediately to the Buyer.  The Buyer shall pay the reasonable costs and expenses associated with sending the opt-out notices to Customers, and transferring to Buyer, or destroying, the Customer Data.

7.     **Conditions to Obligation to Close**.

7.1     **Conditions to Obligation of the Buyer**.  The obligation of the Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(a)     the representations and warranties set forth in Section 3 will be true and correct in all material respects at and as of the Closing Date;

(b)     the Seller will have performed and complied with all of its covenants contained in this Agreement in all material respects through the Closing;

(c)     no action, suit or proceeding shall be pending or threatened before any Governmental Authority in which an unfavorable injunction, judgment, order, decree, ruling or charge would:  (i) prevent consummation of any of the transactions contemplated by this Agreement; (ii) cause any of the transactions contemplated by this Agreement to be rescinded following

consummation; or (iii) affect adversely the right of the Buyer to own the Acquired Assets or to operate the Business;

(d)     the Sale Approval Order and the Assignment Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been modified, reversed, vacated, rescinded, or stayed.

(e)     no injunction or order prohibiting the transfer of more than 30% of the Customer Data or Customer Usage Data shall be in effect; provided, that, for purposes of calculating the 30% threshold, Customer Data or Customer Usage Data shall mean the Customer Data or Customer Usage Data with respect to the total current active Customers set forth in the May 2009 monthly dashboard report contained in the June 10, 2009 board of directors presentation;

(f)     Seller shall have complied with its obligations under Section 5.7;

(g)     the Seller will have executed and delivered to the Buyer a certificate to the effect that each of the conditions specified in this Section 7.1(a) to (c) is satisfied in all respects;

(h)     there will not have occurred any material adverse change in the condition (financial or otherwise), properties, business operations, results of operations or prospects of the Seller or the Acquired Assets, individually or in the aggregate;

(i)     the Buyer will have received all necessary authorizations, consents and approvals of any Governmental Authority required hereunder, including the Buyer becoming an authorized service provider under the Registered Traveler program operated by a Transportation Security Administration;

(j)     Seller shall have paid the Break-Up Fee and the Expense Reimbursement;

(k)     delivery of a bill of sale and all other agreements reasonably requested by Buyer necessary to transfer title to and/or assign the Acquired Assets and Assumed Liabilities to Buyer, free and clear of all liens and encumbrances, claims and other debts of any nature, including without limitation, the release of the Lender Lien, provided however, that any contract set forth on Schedule 1 hereto not transferable under Section 365 of the Bankruptcy Code or otherwise without the consent of a third party shall not be required to be transferred in accordance herewith absent such consent;

(n)     Each of the Sale Order and Assumption Order shall (i) be a final order (or orders) of the Bankruptcy Court which has been entered on the Bankruptcy Court docket and shall not be subject to any stay or injunction, including the 10-day stay under Rules 6004(g) and 6006(d) of the Bankruptcy Code,

and (ii) be in a form and substance acceptable to the Buyer in its sole discretion;

(o)  The Buyer and the Seller shall have delivered joint written instructions to the Escrow Agent under the Escrow Agreement.

(p)  the Seller will have delivered a certified copy of corporate resolutions authorizing the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement;

(q)  the Seller will have delivered such other documents and instruments as are reasonably necessary or appropriate to effect the consummation of the contemplated transactions or that may be required under any Laws or any agreements to which the Seller is a party; and

(r)  all actions to be taken by the Seller in connection with consummation of the contemplated transactions and all certificates, opinions, instruments and other documents required to effect these transactions will be reasonably satisfactory in form and substance to the Buyer.

The Buyer may waive any condition specified in this Section 7.1 by providing a written waiver at or prior to the Closing.

7.2  **Conditions to Obligation of the Seller**.  The obligation of the Seller to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(a)  the representations and warranties set forth in Section 4 above will be true and correct in all material respects at and as of the Closing Date;

(b)  the Buyer will have performed and complied with all of its covenants contained in this Agreement in all material respects through the Closing;

(c)  no action, suit or proceeding will be pending or threatened before any Governmental Authority in which an unfavorable injunction, judgment, order, decree, ruling or charge would:  (i) prevent consummation of any of the transactions contemplated by this Agreement; (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling or charge will be in effect); or (iii) affect adversely the right of the Buyer to own or otherwise assume the transfer of the Acquired Assets or operate the Business;

(d)  the Buyer will have delivered to the Seller a certificate to the effect that each of the conditions specified above in this Section 7.2(a) to (c) is satisfied in all respects;

(e)     The Buyer and the Seller shall have delivered joint written instructions to the Escrow Agent under the Escrow Agreement.

(f)     receipt of the Purchase Price, and the Buyer Note; and

(g)     no injunction or order inhibiting the transfer of the Customer Data or Customer Usage Data shall be in effect.

The Seller may waive any condition specified in this Section 7.2 by providing a written waiver at or prior to the Closing.

8.      **Termination**.

8.1     **Termination of Agreement**.  The Parties may terminate this Agreement as provided below:

(a)     the Buyer and the Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b)     Reserved;

(c)     the Buyer may terminate this Agreement by giving written notice to the Seller at any time prior to the Closing (i) in the event the Seller has breached any representation, warranty or covenant contained in this Agreement in any material respect, the Buyer has notified the Seller of the breach and the breach has continued without cure or written waiver of the breach by the Buyer for a period of 30 days after the notice of breach, or (ii) if the Closing will not have occurred on or before March 26, 2010, for any reason; and

(d)     the Seller may terminate this Agreement by giving written notice to the Buyer at any time prior to the Closing (i) in the event the Buyer has breached any representation, warranty or covenant contained in this Agreement in any material respect, the Seller has notified the Buyer of the breach and the breach has continued without cure or written waiver of the breach by the Seller for a period of 30 days after the notice of breach, or (ii) if the Closing will not have occurred on or before March 26, 2010, for any reason.

8.2     **Effect of Termination**.  If any Party terminates this Agreement pursuant to Section 8.1, all rights and obligations of the Parties under this Agreement will terminate without any Liability of any Party to any other Party (except for any Liability of any Party then in breach).

9. **Miscellaneous**.

9.1    **Press Releases and Public Announcements**.  No Party will issue any press release or make any public announcement relating to the subject matter of this Agreement prior to the Closing without the prior written approval of the other Party.  Any Party may, however, make any public disclosure it believes in good faith is required by applicable Law or any listing or trading agreement concerning its publicly-traded securities (in which case the disclosing Party will use its reasonable best efforts to advise the other Party prior to making the disclosure).

9.2    **No Third-Party Beneficiaries**.  This Agreement will not confer any rights or remedies upon any Person (including without limitation employees of the Seller) other than the Parties and their respective successors and permitted assigns.

9.3    **Entire Agreement**.  This Agreement (including the documents referred to in this Agreement) and the Transaction Documents constitute the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, to the extent they related in any way to the subject matter of this Agreement.

9.4    **Succession and Assignment**.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests or obligations under this Agreement without the prior written approval of the other Party.  The Buyer, however, may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates, and (b) designate one or more of its Affiliates to perform its obligations under this Agreement (in any or all of which cases the Buyer nonetheless will remain responsible for the performance of all of its obligations).

9.5    **Counterparts and Facsimile Signatures**.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument, and by facsimile.

9.6    **Headings**.  The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

9.7    **Notices**.  All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand, or sent by email, or sent, postage prepaid, by United States registered, certified or express mail, or reputable overnight courier service, and shall be deemed given, if delivered by hand or email, when so delivered or, if sent by mail, three business days after mailing (two business days in the case of express mail), or if sent by overnight courier service, one business day after delivery to such service, as follows:

If to the Seller:  Verified Identity Pass, Inc.
600 Third Avenue
10th Floor
New York, NY 10016
Attention:  Jim Moroney
Email:  jmoroney@dormanandfawcett.com

Copy to:                    Hanify & King
One Beacon Street
21st Floor
Boston, MA 02108
Attention:  Charles R. Bennett, Jr.
Email:  crb@hanify.com

Arent Fox LLP
1675 Broadway
New York, NY 10019
Attention:  Schuyler G. Carroll
Email:  schuyler.carroll@arentfox.com

If to the Buyer:           Alclear, LLC
595 Madison Avenue, 39th Floor
New York, NY 10022
Attention:  Caryn Seidman-Becker
Kenneth Cornick
Email:  caryn@algoodholdings.com
ken@algoodholdings.com

Copy to:                    Akin Gump Strauss Hauer & Feld LLP
One Bryant Park, 42nd Floor
New York, NY 10036
Attention:  Adam Weinstein
Email:  aweinstein@akingump.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Agreement.

9.8    **Governing Law**.  This Agreement will be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule.

9.9    **Amendments and Waivers**.  No amendment of any provision of this Agreement will be valid unless the same is in writing and signed by the Buyer and the Seller. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any

prior or subsequent default, misrepresentation or breach of warranty or covenant under this Agreement or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

9.10 **Severability**. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions of this Agreement or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

9.11 **Expenses**. Except as otherwise provided in Section 5.7 hereof, the Buyer and the Seller will each bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the contemplated transactions.

9.12 **Construction**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The Parties intend that each representation, warranty and covenant have independent significance. If any Party has breached any representation, warranty or covenant in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not breached does not detract from or mitigate the fact that the Party is in breach of the first representation, warranty or covenant.

9.13 **Incorporation of Exhibits and Schedules**. The Exhibits and Schedules identified in this Agreement are incorporated by reference and are made a part of this Agreement.

9.14 **Specific Performance**. Each of the Parties acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the Parties agrees that the other Party is entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement in any action instituted in any court of the United States or any state having jurisdiction over the Parties and the matter (subject to the provisions set forth in Section 9.15 below), in addition to any other remedy to which it may be entitled, at law or in equity.

9.15 **Submission to Jurisdiction**. Each of the Parties submits to the jurisdiction of any state or federal court sitting in New York County, in the State of New York, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined there. Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the Parties waives any

defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other Party.  Each Party agrees that a final judgment in any action or proceeding so brought will be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or in equity.

[THE REMAINDER OF THIS PAGE IS BLANK.  SIGNATURE PAGE FOLLOWS.]

fb.us.4453250.16

The Parties have executed this Agreement as of the date first above written.

**BUYER**:

ALCLEAR, LLC

By: Alclear Holdings LLC, its Managing Member

By:_____
    Name: Caryn Seidman-Becker
    Title: Chief Executive Officer

**SELLER**:

VERIFIED IDENTITY PASS, INC.

By:_____
    James S. Moroney, CEO

# Schedule 1

## Acquired Assets

1.  Tangible personal property, including machinery, equipment, inventories of raw materials and supplies, manufactured and purchased parts, goods in process and finished goods, furniture, computers, and automobiles, wherever located.

2.  Intellectual Property, associated goodwill, licenses and sublicenses, remedies against infringements, and rights to protection of interests under any Law, including any Seller Intellectual Property held or residing at Lockheed Martin.

3.  Accounts, notes and other receivables.

4.  Claims, deposits, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment (including any such item relating to the payment of Taxes), other than Seller's claims against third parties relating to any Excluded Assets;

5.  Permits.

6.  Books, records, ledgers, files, documents, databases, correspondence, lists, plans, architectural plans, drawings and specifications, creative materials, advertising and promotional materials, studies, reports and other printed or written materials;

7.  Nondisclosure Agreement, dated as of July 8, 2009, by and between Verified Identity Pass, Inc., and Effective Partners LLC.

8.  Customer Data and Customer Usage Data.

9.  Computer servers currently located at Rockefeller Group Technology Solutions company.

10. [Nondisclosure Agreements / Term Sheets, dated as of _____ with Henry, Inc. or Affiliates]

11. Reserved.

12. Reserved.

13. Reserved.

14. [Confidentiality, Non-disclosure, and/or Intellectual Property Assignment Agreements with any current or former officers, directors, employees and consultants].

15. Reserved.

16.     Reserved.

17.     Reserved.

18.     Reserved.

19.     Reserved.

20.     Reserved.

21.     Reserved.

22.     Reserved.

23.     Reserved.

24.     Reserved.

25.     Reserved.

26.     Reserved.

27.     Reserved.

28.     Reserved.

29.     Reserved.

30.     Reserved.

31.     Reserved.

32.     Reserved.

33.     Reserved.

34.     Reserved.

35.     Reserved.

36.     Reserved.

37.     Reserved.

38. Reserved.

39. Reserved.

40. Reserved.

41. Reserved.

42. Reserved.

43. Reserved.

44. Reserved.

45. Reserved.

46. Reserved.

47. Reserved.

48. Reserved.

49. Reserved.

50. Reserved.

51. Reserved.

52. Reserved.

53. Reserved.

54. Reserved.

55. Reserved.

**Exhibit A**
**Escrow Agreement**

**Exhibit B**
**Buyer Note Terms**